**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 21-cr-311** |
| **STANLEY WOLOFF** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Jennifer Arbittier Williams, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Deputy United States Attorney for the District, hereby submits its sentencing memorandum in the above-captioned case.

## I.   PRELIMINARY STATEMENT

Over a six-year period, defendant Stanley Woloff, a SEPTA vendor, engaged in repeated acts of fraud and bribery in a scheme involving managers in SEPTA's Bridges and Buildings Department. This scheme generated over $330,197 in proceeds for Woloff and the corrupt SEPTA managers who were engaged in similar criminal activity with another SEPTA vendor, Mark Irvello. In total, this criminal activity, under the most conservative estimates, resulted in almost $900,000 in losses to SEPTA and did tremendous monetary and psychic damage to SEPTA, its employees, and the citizens who fund SEPTA through the payment of taxes and ridership fares. Such conduct calls for serious punishment.

On the other hand, the defendant admitted to his illegal conduct during the investigation, has shown remorse, and has accepted responsibility for his actions. For these reasons and the reasons set forth below and in other sentencing documents, the government recommends a sentence below the advisory guideline range of 46-57 months' imprisonment. In particular, the government recommends a sentence within a range of 18-24 months, which is the equivalent of an 8-level downward adjustment under the Sentencing Guidelines.

## II.   SUMMARY OF THE CRIMINAL ACTIVITY

### A.   Introduction

The charges arose from the defendant's participation in a fraud and bribery scheme involving managers in the Bridges and Buildings Department ("BBD") of the Southeastern Pennsylvania Transportation Agency ("SEPTA") and vendors who supplied products to the BBD. The BBD is responsible for maintenance, construction, and rehabilitation work performed at various SEPTA locations. Several SEPTA managers in the BBD used their SEPTA-issued credit cards ("P-Cards") to defraud SEPTA by obtaining cash and personal products from vendors who supplied goods to SEPTA. To cover cost of the products and cash provided to SEPTA employees, the vendors billed SEPTA for products that the vendors did not provide to SEPTA. The vendors generally billed SEPTA as much as double the amount provided to the corrupt managers so they could share in the criminal proceeds. The vendors provided the cash and products to SEPTA managers for two reasons: (1) to generate and share fraud proceeds with the

2

SEPTA managers; and (2) to maintain and increase business from SEPTA. The total loss to SEPTA is approximately $900,000.

Woloff was the owner and operator of Advantage Industrial Supply ("AIS"), located at 2137 East Tioga Street in Philadelphia, Pennsylvania. AIS sold industrial supplies and other products to various customers, including SEPTA, through employees in the BBD. Woloff was one of the two vendors in this scheme who provided benefits to the SEPTA managers in exchange for sharing in the profits of both fraudulent and legitimate billing to SEPTA.

### B.    General Background Facts

SEPTA is a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the States of Delaware and New Jersey. SEPTA is an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance. In fact, in each of the years of the charged fraud, SEPTA received well over $100 million from federal sources.

Throughout the time of the fraud discussed in this memorandum, SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to managers working in SEPTA's BBD. The managers worked at various jobsites where SEPTA facilities were under construction for rehabilitation and renovation. SEPTA had established written rules and procedures that were provided to these employees

concerning the use of these cards.

SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those materials and equipment that were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order process. The SEPTA Procurement Card Procedures Manual ("the Manual") specifically provided that the procurement card program was "not an alternative to, nor is it intended to circumvent, the normal procurement policies and procedures."

Consistent with the purpose of the procurement cards, beginning in 2017, the Manual further limited the use of the cards to (1) $1,000 for a single transaction; (2) $4,000 for daily purchases; (3) and no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

### C.   <u>The Fraud Activity</u>

#### 1.   <u>The Overall Scheme</u>

For many years, beginning around 2013, SEPTA managers with the BBD engaged in a fraud and bribery scheme with particular SEPTA vendors to defraud SEPTA by abusing SEPTA's P-Card system. The vendors provided SEPTA managers with cash and

merchandise in exchange for vendors billing SEPTA for products that the vendors did not provide. The vendors shared in the proceeds of the fraud.

The two primary vendors involved in this fraud were MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI") and Advantage Industrial Supply ("AIS"). SEPTA records show that MSI was the highest biller on the SEPTA P-cards. From 2010 through 2019, MSI billed SEPTA approximately $3.7 million for products and tool repair services. The third highest biller during this period was AIS, charging SEPTA $1.9 million for industrial supplies. MSI was owned and operated by Mark Irvello.

The scheme began around 2013 when David Abell separately agreed, first with Irvello of MSI, and then with Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and

directed other SEPTA managers and employees in the BBD to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS without necessarily knowing why they were encouraged to use these vendors.

After agreeing to engage in this scheme, Abell regularly solicited and demanded cash payments from the vendors. Irvello and Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then falsely billed SEPTA for products that they did not provide to SEPTA. The bills appeared legitimate on their face because they were for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

Working with Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA

without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

Irvello and Woloff provided Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

Approximately one year before David Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez, making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the fraud scheme.

Irvello and Woloff then made regular cash payments to Abell and Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

Beginning on or about May 25, 2016, when Abell left the employment of SEPTA, Woloff continued the fraud scheme with Martinez. That is, Martinez regularly solicited cash payments from Woloff who provided cash to Martinez and fraudulently billed SEPTA through the P-Cards to cover the cash payments and the defendant's share of the fraud proceeds.

Around this time, Martinez invited Fleck to join the scheme with Woloff. At the request of Martinez, Fleck helped identify the items for which Woloff would falsely bill SEPTA. Fleck then shared, in part, in the cash proceeds he obtained from Woloff.

Several other SEPTA BBD managers, including those identified in the information, engaged in similar fraud activity with vendors Irvello and Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors. The cash and items Woloff provided to SEPTA managers included, for example, HVAC equipment for Abell; a Weber Genesis II grill and thousands of dollars in cash payments to Stephen Kish; a Weber Genesis II grill for Peter Brauner; a WoodMaxx-6600 tractor backhoe attachment for Brauner; an Echo Show and Ring doorbell for James Turner; and Yeti coolers for Jesse Fleck.

From in or about 2013 through in or about 2019, Irvello and Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000. As part of this scheme, Woloff personally obtained more than $139,000 in fraud proceeds.

### III.     STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: Count One (aiding and abetting theft from a program receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count Two (bribery involving a program receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count Three (wire fraud), 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 40 years' imprisonment, a three-year period of supervised release, a $750,000 fine, and a $300 special assessment. Full restitution of $330,197 also shall be ordered. Forfeiture of $139,273, which represents all proceeds obtained by the defendant from the fraud and bribery offenses also shall be ordered.

### IV.     SENTENCING GUIDELINES

The government agrees with the guideline calculation for the bribery offense, which drives the calculation in this case, as set forth in the Presentence Investigation Report ("PIR"): Under USSG § 2C1.1(a)(2), the base offense level for bribery is 12. Under USSG § 2C1.1(b)(1), the offense involved more than one bribe or extortion, resulting in a 2-level increase to the base offense level. Under USSG § 2B1.1(b)(1)(G), the value of that which was obtained by the defendant and his co-schemers, and the loss to SEPTA is more than $250,000 but less than $550,000, resulting in a 12-level increase to the base offense level. The defendant accepted responsibility and did so in a timely

manner, resulting in a 3-level downward adjustment under USSG § 3E1.1(a) and (b).

This results in a total offense level of 23. The defendant is in Criminal History

Category I, yielding a sentencing guideline range of 46 to 57 months in prison.

### Consideration of the 3553(a) Factors

### (1)    The nature and circumstances of the offense

The nature and circumstances of Woloff's criminal conduct are extremely serious

and troublesome. Woloff was a vendor serving a public transit organization and he chose

to take advantage of SEPTA's employee credit card system to steal hundreds of

thousands of dollars from SEPTA, benefitting himself and his business at the expense of

SEPTA and the public. It is also particularly disturbing that this criminal activity

persisted over several years and became a daily way of doing business for Woloff and his

corrupt SEPTA customers. Woloff's providing cash and products to SEPTA managers

while falsely billing SEPTA for products it was not receiving to generate illicit profits for

Woloff represents the height of brazen fraud activity. Woloff was a successful

businessperson who did not need to engage in this conduct, and his choosing to do so

reflects unmitigated greed.

Crimes like this do tremendous damage to federally funded agencies like SEPTA.

They cause the taxpayers and citizens of Philadelphia to lose faith in the integrity of one

of the largest metropolitan transportation organizations in the country. People are already

cynical about government and government-funded entities like SEPTA, and internal

fraud and bribery activity as charged in this case, fans the flames of this cynicism.

10

Internally at SEPTA, these crimes demoralize the dedicated, honest, and hard-working employees who worked with and for the corrupt supervisors charged in this case. SEPTA has expended and will continue to expend substantial financial and psychic resources trying to repair the damage from the fraud and ensure that it does not happen again.

SEPTA provided a victim impact statement, signed by Denise S. Wolf, Inspector General, and Robin Deveney, Director, Procurement & Supply Chain Management Audit, in which they expressed the ways in which this crime damaged the organization:

> The criminal fraud executed by nine bad actors damaged this organization, its employees, and the members of the public who rely on us for their transportation needs. To put it simply, it hurt a lot. We still feel the impact --- financial loss, decreased morale, and damaged reputation -- and the effects of this fraud on the organization are not going away any time soon. SEPTA is not a for-profit enterprise; it relies heavily on funding from taxpayers to subsidize the fares received from riders. We depend on the integrity of each of our employees to steward these public funds and provide transit services to millions of riders. When employees – even if only a small number -- violate this public trust, the damage to our organization is tremendous.

This was obviously a serious crime that had a substantial impact on the victim, and the government's sentencing recommendation appropriately accounts for this sentencing factor.1

---

1 In his sentencing memorandum, the defendant suggests that the bribery guidelines overstate the seriousness of this offense. The facts show otherwise. As discussed throughout this memorandum, at the highest level of the scheme here, the conduct involved the insidious nature of public employees accepting bribes in the form of cash and products in exchange for benefits flowing to the vendor. Those benefits to the vendor included immediate fraudulent profits on the illicit transactions as well as the regular and increasing flow of business generated by SEPTA employees who could have purchased products for their work assignments from any number of businesses. But they shopped with the vendors who were providing the highest-level managers

**(2)**     **The history and characteristics of the defendant.**

Stanley Woloff is a 71-year-old man who lives with his wife and has a supportive family. The defendant has no drug, alcohol, or mental health problems. He has no criminal history. Unlike so many cases that come before this Court, the defendant's personal history does not offer any explanation for his decision to engage in this criminal conduct. Clearly, the defendant should have known better.

To the defendant's credit, even before he was confronted by the government about this fraud, the defendant fully admitted to his misconduct and expressed remorse. He has conducted himself extremely well throughout the investigation and litigation of this case. The government's recommended below-guidelines sentence properly accounts for the defendant's history and characteristics.

**(3)**     **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4)**     **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

A prison sentence below the applicable guidelines in the range recommended by the government under all the facts and circumstances of this case (including those set forth in other sentencing documents) would appropriately punish the defendant for victimizing SEPTA through his fraud and bribery scheme. The recommended sentence

---

with substantial cash kickbacks. In turn, those managers encouraged their employees to shop with the corrupt vendors.

would promote respect for the law and deter public employees and business who serve public agencies from engaging in this type of fraud and bribery activity. Crimes like this are difficult to detect, as evidenced by the length of time that the defendant and others engaged in the crimes here, making it even more essential that the sentence deter those who might engage in this type of criminal activity.

As numerous courts have recognized, fidelity to the guidelines and imposing serious prison sentences serve a particularly important purpose in the area of white-collar crime.  For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals."  *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses").  In *United States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.' S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.' *Id.*

13

455 F.3d 1227, 1240 (11th Cir. 2006).

This is especially true here. The sentence imposed must communicate to Woloff and the public that the justice system will not tolerate this type of fraud and bribery activity. The sentence recommended by the government, which amounts to significant prison time for this first-time offender, would send the appropriate message to the community that anyone who engages in fraud and bribery will suffer serious consequences.

**(5)     The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant, a skilled and experienced businessperson, with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Considering all the facts and circumstances discussed in this memorandum and elsewhere, the recommended sentence would not result in any unwarranted disparities among similarly situated defendants. The recommended sentence fairly considers this defendant's conduct and the circumstances of his case and would be consistent with the sentences of defendants in other cases of this nature, including that of other defendants in this case. The government's sentencing recommendations for the participants in this scheme reflect consider their relative culpability and the individual facts and

14

circumstances of each case.

Considering the relative culpability of the defendants in this scheme, Rodney Martinez, David Abell, and Stephen Kish are at the higher level of culpability among the SEPTA employees. David Abell was the originator of the scheme and a prolific participant, regularly obtaining cash from both vendors and encouraging his employees to purchase products for SEPTA from the corrupt vendors. He brought Martinez into the scheme who then took over Abell's role and helped Abell continue to profit from the scheme after Abell left his high-ranking position and continued with SEPTA as a contractor. Martinez then regularly obtained cash and brought Fleck into the scheme to assist him in the false billing. Kish was below Abell and Martinez in the SEPTA hierarchy but was the most prolific SEPTA manager in the fraud, obtaining over $250,000 in proceeds, much of it in the form of gold.

At the lower level of culpability among the SEPTA employees are James Turner, Jesse Fleck, John Brady, and Peter Brauner. They were lower-level managers than Abell and Martinez and they participated to a lesser extent in the fraud than Abell, Martinez, and Kish.

The corrupt vendors in this case, Irvello and Woloff, should be considered more culpable than the lower-level SEPTA participants in the scheme because their conduct was far more extensive and involved repeated fraud and bribery activity over several years. While they did not abuse the trust of the public and SEPTA as did the SEPTA managers, Irvello and Woloff were a substantial engine driving the criminal activity in

15

the multiple schemes involved in these cases. Their culpability thus is closer to that of the higher-level SEPTA employees, but without the abuse of the public trust that represents the most abhorrent aspect of the criminal activity in this case.

The sentence recommended by the government in this case properly accounts for the relative culpability of Woloff along with the other facts and circumstances of this case, discussed here and elsewhere.

(7)   **The need to provide restitution to any victims of the offense.**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. Under the terms of the plea agreement, the defendant should be ordered to pay restitution of $330,197 and forfeiture of $139,273. To the defendant's credit, at the time of sentencing the defendant intends to pay $200,000 toward restitution. In addition, the defendant will be able to make monthly payments toward his financial obligations while in prison and after he is released.

V.   **RESPONSE TO DEFENDANT'S SENTENCING RECOMMENDATION**

The defendant seeks a non-custodial sentence of one-year home confinement. He bases this request, among other reasons, on the following: (1) payment of $200,000 toward restitution at the time of sentencing; (2) his "virtually non-existent risk of recidivism;" (3) the collateral consequences of this conviction; (4) his "sister's medical condition and his role as a support and caretaker;" (5) the ways in which the defendant "has already started to move forward personally and professionally; and (6) the risks of COVID for the defendant if incarcerated.

16

The government strenuously objects to this request for the defendant to avoid prison time for a serious white-collar offense in which he engaged repeatedly over a period of years. The factors on which the defendant relies, to whatever extent they are relevant, are easily captured in the government's request for a below-guideline prison sentence based on the facts discussed here and in other sentencing documents.

Starting with the defendant's request for a non-custodial sentence based on his payment of restitution, it is certainly a positive factor that he has begun to repay the victim the funds he stole. But that is exactly what the defendant should be doing if he has the financial ability to make these payments. *See, e.g., United States v. Zieske,* 784 Fed. App'x 481, 484 (9th Cir. 2019) (unpublished) (affirming district court's rejection of variance for payment of restitution because such payments to "remedy the harm caused by the offense" are not exceptional) (citing U.S.S.G. § 5K2.0(d)(5) (policy statement).

Likewise, Application Note C to U.S.S.G. § 3E1.1 provides that "voluntary payment of restitution *prior to* adjudication of guilt" is a factor in determining whether the defendant qualifies for a 2-level downward adjustment for acceptance of responsibility. The guidelines thus already account for the defendant's payment of restitution, which here did not come until long after he pleaded guilty. By analogy, courts have found that even full restitution is not an appropriate ground for departure from the Guidelines, but simply ground for a reduction within the Guidelines. *See, e.g., United States v. Bean*, 18 F.3d 1367, 1369 (7th Cir. 1994) (finding repayment of the entire amount fraudulently obtained from a bank ($75,000) constituted the restitution

17

contemplated under Note 1(c) to § 3E1.1 and the defendant was therefore limited to a reduction within the Guidelines); *United States v. Brewer*, 899 F.2d 503, 509 (6th Cir. 1990) (prompt repayment of entire $25,000 stolen only entitled defendant to a reduction within Guidelines, not departure). The Sixth Circuit Court of Appeals appropriately pointed out that rewarding a defendant who can afford to pay restitution in the form of a below-guideline sentence would unfairly benefit wealthier defendants at the expense of those who are less fortunate. The guidelines were not intended to create such unfair disparities. *United States v. Demonte,* 25 F.3d 343, 346-47 (6th Cir. 1994). Here, the government's recommended sentence would properly account for the defendant's restitution payments in this case.

Likewise, the government recognizes that the defendant is unlikely to re-offend and has moved forward in his life since engaging in this criminal conduct. However, the government not seeking a sentence based on specific deterrence. As discussed above, general deterrence is a critical component to sentencing here, and that factor would be substantially undermined if this defendant were able to avoid prison. When white collar criminals go to prison for their misconduct (as opposed to serving a sentence of house arrest, akin to life during the pandemic) it sends a far different and important message about the consequences of such crimes. It simply unacceptable to conclude that one can engage in fraud and bribery involving a public entity and hundreds of thousands of dollars in losses, as is the case here, and avoid jail because one is not likely to re-offend.

The medical condition of the defendant's sister also does not warrant a non-

custodial sentence. It is true that a district court has the authority to depart downward under the Guidelines for extraordinary or unusual family circumstances. *See, e.g., United States v. Dominguez,* 296 F.3d 192, 196 (3d Cir. 2002). Even though the defendant is not formally requesting a "downward departure" on this basis, the guidelines on this issue are instructive. U.S.S.G. § 5H1.6 clearly states that family ties are not ordinarily relevant in determining whether a departure may be warranted. *United States v. Gaskill*, 991 F.2d 82, 84-85 (3d Cir. 1993). In fact, the Sentencing Commission has classified the existence of family ties and responsibilities as a "discouraged" basis for departure. *Koon v. United States*, 518 U.S. 81, 95 (1996). *See also* Section 5H1.6 app. note 1(B). The Third Circuit repeatedly has held that downward departures based on family ties and responsibilities should be the exception rather than the rule. *United States v. Sweeting*, 213 F.3d 95, 100 (3d Cir. 2000); *United States v. Higgins*, 967 F.2d 841, 846 (3d Cir. 1992). The exception is defined as a "very narrow category" of "extraordinary." *Higgins*, 967 F. 2d at 846.

The defendant is a part-time caretaker of his sister who has special needs. That situation it is not so extraordinary to warrant the non-custodial sentence that the defendant seeks. There are others who already care for the defendant's sister, and they can continue to do so while the defendant is incarcerated. There are unfortunate but ordinary consequences that follow from convictions for serious crimes, including the loss of support for family members. The defendant's family circumstances do not warrant the extraordinary leniency requested by the defendant.

Similarly, the defendant is not entitled to a non-custodial sentence to account for

the collateral consequences of the defendant losing the full value of his business and other financial challenges. These too are ordinary and expected consequences of engaging in a serious fraud and bribery scheme with one's business and do not justify the extreme reduction of sentence sought by the defendant.

Finally, the defendant is not entitled to a non-custodial sentence because of general risks associated with COVID-19. The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not justify a non-custodial sentence. In the context of compassionate release motions under 18 U.S.C. § 3582(c)(1)(A)(i), the Third Circuit has held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

In addition, the BOP has engaged in aggressive efforts to mitigate the spread of COVID-19, including through a campaign to vaccinate all willing inmates. A substantial portion of the inmate population has been vaccinated. BOP has done well during the pandemic, with a very low death rate. While there have been 294 inmate deaths related to

COVID-19 at BOP institutions (which at the outset of the pandemic held over 157,000 inmates), there have close to one million deaths in the general population. Both figures represent tragedies, but the defendant cannot show that the toll in BOP facilities is materially worse than in the rest of the country. Currently there are only 73 known positive cases in an inmate population nationwide of about 150,000. The latest statistics are available at www.bop.gov/coronavirus.

The defendant has not suggested that he presents any particular increased risk associated with COVID-19, other than his age (71), and he presumably has been vaccinated (since he does not state otherwise). Particularly at this stage of the pandemic and given the facts of this case and statutory sentencing factors discussed above, COVID-19 does not provide a basis for the defendant to avoid a prison sentence.

## VI.   GOVERNMENT'S SENTENCING RECOMMENDATION

For all the reasons set forth above, the government requests that this Court impose a prison sentence below the guideline range of 46 to 57 months, and within a range of approximately 18-24 months, which would be consistent with an 8-level reduction under the Sentencing Guidelines. This Court should also impose restitution and forfeiture as noted above. Such a sentence would properly consider all the sentencing factors in the context of this case, particularly the seriousness of the offense and the need to promote

respect for the law and deter others from engaging in similar illegal conduct.

.

               Respectfully submitted,

               JENNIFER ARBITTIER WILLIAMS
               United States Attorney


               *s/ Louis D. Lappen*
               LOUIS D. LAPPEN
               Deputy United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been filed on ECF and served via email upon:

>Judson A. Aaron, Esquire
>Lorie Dakessian, Esquire
>Conrad O'Brien
>1500 Market Street
>Center Square
>West Tower, Suite 3900
>Philadelphia, PA 19103
>E-mail: jaaron@conradobrien.com
>ldakessian@conradobrien.com

>*/s Louis D. Lappen*
>LOUIS D. LAPPEN
>Deputy United States Attorney

Date:  April 28, 2022